**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**AWOKE GEBRETSADIKE,**

    *Plaintiff,*

**v.**

**DISTRICT OF COLUMBIA,** *et al.,*

    *Defendants.*

**Case No. 1:22-cv-1951-RCL**

### <u>MEMORANDUM OPINION</u>

In this civil rights suit, plaintiff Awoke Gebretsadike, *pro se*, alleges that defendants, the District of Columbia and several of its officers (together, "the District"), violated his statutory and constitutional rights by denying him pandemic unemployment assistance ("PUA") benefits and failing to make the application for those benefits, or assistance in completing the application process, available in his native language, Amharic. Before the Court is the District's motion to dismiss. ECF No. 8.

For the following reasons, the Court will **GRANT** in part and **DENY** in part the District's motion to dismiss. Specifically, the Court will **DISMISS WITHOUT PREJUDICE** Counts I and III–VI of the complaint for failure to state a claim upon which relief can be granted and Count VII for lack of subject-matter jurisdiction. The Court will not dismiss Count II.

## I.   BACKGROUND

Gebretsadike is a resident of the District of Columbia whose "nation of origin language" is Amharic. Compl. at 2, ECF No. 1-2. He "used to have a living income from [his] self-employment prior to" the COVID-19 pandemic, but "the health measures [the] government took affected [his] living income," which depended on "tourists . . . enter[ing] into the country." *Id.*

1

Due to the impact that public health measures in early 2020 had on his work, Gebretsadike applied for PUA administered by the D.C. Department of Employment Services ("DOES") pursuant to the CARES Act. *Id.* He was initially placed on a "waiting list," eventually gaining access to the PUA application on April 27, 2020. *Id.* Gebretsadike did not find the application "easy to understand or fill [out,]" especially because he had "never been in these state[] run unemployment systems before." *Id.* Accordingly, he "contacted [DOES] a lot of times for help and clarification" but received no help. *Id.* In particular, DOES did not provide the application or instructions in Amharic, and "[g]etting the applications interpreted and/or clarifying the jargon[] was [a] quite difficult task." *Id.* Nevertheless, Gebretsadike was able to complete the application by April 29, 2020, and he "continued to take the weekly actions necessary to keep qualifying for benefits." *Id.*

When "DOES started depositing payments," Gebretsadike found himself receiving his benefits later than expected. *Id.* at 3. "[O]ther claimants started receiving payments within five days," but "DOES held [his] payments." *Id.* He "tried to contact DOES," but he was unable to receive Amharic-language assistance. *Id.* He then "tried to get professional interpreter[s] from other states and reached [out] to DOES for help." *Id.* DOES eventually paid him on June 8, 2020, over a month after he filed his application. *Id.* When he received his payment, it was less than what "other language and English speaking applicants who are less experienced" than him received. *Id.* DOES "made payments retroactively based on the [CARES Act] for other people but not for [him]." *Id.* He "repeatedly reached [out to] DOES for help and explanation" to no avail. *Id.*

Furthermore, DOES "sent [Gebretsadike an] email" on June 8, 2020 suggesting that his "applications for these benefits have been processed," but "without any kind of information or notice" as to how "to dispute their decision or denials," or any explanation of the basis for DOES's

decision. *Id.* He "tried to reach [out] to different authorities [he] could think of that could help," but was unable to resolve the issue. *Id.*

Eventually, Gebretsadike received a letter stating DOES's initial determination of his benefits, but that letter had "no description of [the] factual and legal basis," simply instructing Gebretsadike "to apply for redetermination." *Id.* at 6–7. He "applied for their re-determination process," but received no hearing or interview, and, as of the time of the complaint, two years later, still had not received "any final decisions" on that administrative appeal. *Id.* at 7.

Gebretsadike originally filed this action in the Superior Court of the District of Columbia on May 19, 2022, alleging seven counts: (1) discrimination on the basis of national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; (2) retaliation for protected activities in violation of Title VI; (3) inadequate procedures in violation of the Fifth Amendment's due process clause; (4) retaliation for protected speech in violation of the First Amendment; (5) discrimination on the basis of national origin in violation of the equal protection component of the Fifth Amendment's due process clause; (6) failure to make unemployment payments when due or provide a hearing in violation of Title III of the Social Security Act, 42 U.S.C. §§ 501–504; and (7) failure to make timely unemployment benefit determinations in violation of various D.C. statutes and regulations. *See* Compl. at 13–28. The District removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446 and Federal Rule of Civil Procedure 81(c). *See* Not. of Removal, ECF No. 1.

The District filed its motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) on August 12, 2022. ECF No. 8. Gebretsadike filed his opposition on September 12, 2022. ECF No. 9. The District filed its reply on September 19, 2022. ECF No. 10. The motion to dismiss is now ripe for review.

## II.   LEGAL STANDARDS

### A.  Rule 12(b)(6) Motions

A defendant in a civil action may move to dismiss a complaint under Federal Rule of Civil

Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." To survive a

Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations, accepted as true, to

"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim

is plausible on its face if it "pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* A court evaluating a Rule

12(b)(6) "motion presumes that the complaint's factual allegations are true and construes them

liberally in the plaintiff's favor." *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 40

(D.D.C. 2018). However, "[a] court need not accept a plaintiff's legal conclusions as true, . . . nor

must a court presume the veracity of legal conclusions that are couched as factual allegations." *Id.*

(citation omitted).

### B.  Rule 12(b)(1) Motions

A defendant in a civil action may also move to dismiss a complaint under Federal Rule of

Civil Procedure 12(b)(1) for "lack of subject-matter jurisdiction." A court considering such a

motion must take all the well-pleaded allegations in the complaint as true and draw all reasonable

inferences in the plaintiff's favor. *Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354,

361 (D.D.C. 2020). "However, those factual allegations receive closer scrutiny than they do in the

Rule 12(b)(6) context," and the court "may look to documents outside of the complaint in order to

evaluate whether or not it has jurisdiction to entertain a claim." *Id.* (internal quotation marks and

citations omitted). It is the "[p]laintiff [who] bears the burden of proving subject matter jurisdiction

by a preponderance of the evidence." *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

### C. 42 U.S.C. § 1983 and Municipal Liability

42 U.S.C. § 1983 provides a cause of action for any person "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." A municipality such as the District may be liable under § 1983 only if it was a "policy or custom" of that municipality that caused the violation of the plaintiff's rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Thus, a court considering a § 1983 claim against a municipality, sometimes called a "*Monell* claim," "must conduct a two-step inquiry": "First, the court must determine whether the complaint states a claim for a predicate constitutional violation. . . . Second, if so, then the court must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citations omitted). There are four "ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983: [1] the explicit setting of a policy by the government that violates the Constitution, . . . [2] the action of a policy maker within the government, . . . [3] the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become a 'custom,' . . . [4] or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Id.* at 1306–07 (citations omitted).

**D.  Filings by *Pro Se* Parties**

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). "However, even though a *pro se* complaint must be liberally construed, the complaint must nonetheless present a claim on which the court can grant relief." *Williams v. Bank of New York Mellon*, 169 F. Supp. 3d 119, 124 (D.D.C. 2016) (internal quotation marks and citation omitted). That is, a pro se plaintiff is not exempt from the requirements of the federal rules. *See Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681–82 (D.C. Cir. 2009).

### III.    DISCUSSION

Given the common issues involved for certain claims, the Court will take the counts of the complaint somewhat out of order. It will discuss the statutory and constitutional discrimination and retaliation claims together before proceeding to the other claims. For the reasons that follow, the Court will dismiss all but Gebretsadike's Title VI retaliation claim.

**A.  Discrimination Claims (Counts I and V)**

Gebretsadike alleges that the District violated both Title VI and the equal protection component of the Fifth Amendment's due process clause by failing to make the PUA application, or assistance in completing it, available in his "nation of origin language," Amharic, and that as a result of that policy, he received benefits later and in lesser amounts than applicants who speak English and other languages besides Amharic. Compl. at 13–15, 23–26.

The complaint does not specify Gebretsadike's nation of origin. In an effort to construe the complaint liberally, the Court will take judicial notice of the fact that Amharic is one of the official languages of Ethiopia. *See* U.S. Central Intelligence Agency, The World Factbook: Ethiopia, available online at https://www.cia.gov/the-world-factbook/countries/ethiopia (last accessed Mar.

28, 2023). But even assuming without deciding that the references to Gebretsadike's "nation of origin language" being Amharic are enough to plausibly allege that his nation of origin is Ethiopia, the complaint fails to state a claim of discrimination against Ethiopian individuals under either Title VI or the Fifth Amendment. That is because, as the District argues, *see* Mot. to Dismiss at 5, 12–13, neither claim plausibly alleges *intentional* discrimination.

Title VI provides in relevant part that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The Fifth Amendment's due process clause incorporates an equal protection component, enforceable against the District of Columbia, that is coextensive with the Fourteenth Amendment's command that "[n]o State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV; *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The District does not dispute that its PUA benefits program under the CARES Act and the Social Security Act is a program subject to the requirements of Title VI and the equal protection component of the Fifth Amendment. *See* Mot. to Dismiss at 5, 12–13.

"What is necessary, however, for both constitutional and Title VI claims is a showing of *intentional* discrimination." *Smith v. Henderson*, 944 F. Supp. 2d 89, 100 (D.D.C. 2013) (emphasis in original) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) and *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). The District argues that the complaint does not plausibly allege intentional discrimination, *see* Mot. to Dismiss at 5, and the Court agrees. While Gebretsadike styles his discrimination claims as claims of intentional

discrimination, *see* Compl. at 13;[1] Pl.'s Opp'n at 7–8, the factual allegations in the complaint, taken as true, would establish only a disparate impact on Ethiopian applicants.

Nowhere in the complaint does Gebretsadike plausibly allege that any District policymakers or DOES personnel intended to treat Ethiopian applicants worse than other PUA applicants. In order for the District's failure to provide Amharic-language applications and assistance to constitute intentional discrimination against Ethiopian applicants, the policymakers who chose the languages in which such applications and assistance would be provided would have to have singled out Amharic specifically *"because of"* its association with Ethiopian persons.[2] *See Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (emphasis added) (quotation marks and citation omitted). The complaint fails to do so. Indeed, it does not even state which policymakers were in charge of choosing the languages utilized by DOES, much less allege specifically that that is why they excluded Amharic. And while Gebretsadike's opposition argues that "[t]he Complaint clearly indicates DOES presented itself as nationalist and it also demonstrated itself in alignment with the ongoing anti-black whole/all nation immigrants by" inhibiting them from applying for PUA benefits, Pl.'s Opp'n at 7, it does not point to any passage in the complaint alleging as much.

In an effort to give Gebretsadike the special solicitude he is due as a *pro se* plaintiff, the Court has carefully read the complaint in its entirety. The closest the complaint comes to alleging discriminatory intent is the following paragraph:

---

[1] While the complaint uses the word "intentional" only with respect to the Title VI claim, *compare* Compl. at 13 *with id.* at 23, construing the complaint liberally, the Court will assume that Gebretsadike intended to apply the same theory to his equal protection claim, since both claims are based on the same factual allegations.

[2] While the Circuit has not addressed the question, this Court has held "that differential treatment based on language proficiency is not [in itself] synonymous with discrimination based on national origin." *Lemus on behalf of O.C.L. v. District of Columbia Int'l Sch.*, No. 21-cv-223-RCL, 2022 WL 407151, at *8 (D.D.C. Feb. 10, 2022) (Lamberth, J.) (citing *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010)). "There is no doubt that language can be used as a proxy or a vehicle to intentionally discriminate based on national origin. But the *intent* to discriminate based on race, color, or national origin must be present to succeed on a Title VI claim." *Id.* (emphasis in original).

> The Defendant's conduct constitutes intentional discrimination based on national origin in violation of Title VI and based on race. The only one from the "whole" black nations covered by DC Language Access Act is my national origin language or why I am targeted by different aspects. The stated reasons for Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus and actions.

Compl. at 15. Read liberally, that paragraph appears to make essentially three allegations: (1) that DOES was obligated to provide Amharic-language applications and assistance under the D.C. Language Access Act, (2) that it did not, and (3) that any reason for failing to do so is pretext for discriminatory animus against Ethiopian applicants. The third allegation comes the closest to alleging discriminatory intent, but it does so in conclusory fashion, without alleging any factual basis for that conclusion. In short, stating simply that there *was* "discriminatory animus," *id.*, is not enough to "nudge[] [Gebretsadike's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[3]

Gebretsadike further argues with respect to his Title VI discrimination claim that the District incorrectly asks the Court at the pleading stage to apply the *McDonnell Douglas* framework for discrimination claims, which the Supreme Court has held only applies at summary judgment. Pl.'s Opp'n at 5–7; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). Gebretsadike is correct about the applicable standard, but it is beside the point. The Court must dismiss his Title VI discrimination claim not because he fails to plead specific facts that would establish a *prima facie*

---

[3] Another passage in the complaint alleges that at a series of hearings conducted before a D.C. Council committee, DOES officials presented themselves as "DC and US nationalist" by "decorat[ing] with flags conveying [a] message to the effect that DOES is [a] special [savior] of [the unemployment insurance] system from outsiders/immigrants by denying legally eligible essential benefit claims," and that "DOES more than followed through on its own animus." Compl. at 6. But the fact that DOES officials appeared in front of the D.C. and U.S. flags at a hearing could not plausibly establish that those same officials intended to single out immigrants from Ethiopia or any other country for disfavored treatment, and the allegation of "animus" is in no way explained.

case of discrimination or rebut a proffered nondiscriminatory justification, but because the complaint fails to allege in non-conclusory fashion that an *intentionally* discriminatory decision was even *made*.

Because the complaint does not plausibly allege the discriminatory intent required to state a claim for discrimination under Title VI or the equal protection component of the Fifth Amendment, the Court must dismiss Counts I and III of the complaint for failure to state a claim.

### B. Retaliation Claims (Counts II and IV)

Gebretsadike alleges that the District retaliated against him in violation of both Title VI and the First Amendment for his complaints regarding DOES's allegedly discriminatory actions. Compl. at 15–17, 21–22. Those claims overlap significantly, with an important difference: the First Amendment retaliation claim requires an allegation of *Monell* liability.

### 1. Title VI retaliation (Count II)

Although neither the Supreme Court nor the D.C. Circuit has addressed the question, this Court has held that Title VI encompasses retaliation claims as well as discrimination claims. *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 83 (D.D.C. 2003) (Lamberth, J.). The District does not ask the Court to revisit that holding. *See* Mot. to Dismiss at 6–7.

Although "a plaintiff is not required to set forth the *prima facie* elements of a retaliation claim at the initial stage," a plaintiff "may plead himself out of court by alleging facts that indicate [the defendant's] entitlement to prevail . . . . The Court must consider whether [the plaintiff] will *ever* be able to meet his initial burden of establishing a *prima facie* case." *Chandamuri*, 274 F. Supp. 2d at 83–84 (emphasis in original). To make out his *prima facie* case at the summary judgment stage, Gebretsadike would have to demonstrate that "(1) he engaged in protected activity; (2) he was subjected to adverse action and (3) there existed a causal link between the

adverse action and the protected activity." *Id.* at 84 (citing *Jones v. WMATA*, 205 F.3d 428, 433 (D.C. Cir. 2000)).[4]

The District argues that the complaint demonstrates that Gebretsadike will never be able to meet that burden. *See* Mot. to Dismiss at 6–7. The Court disagrees. Construing the complaint liberally, Gebretsadike has not "plead[ed] himself out of court," *Chandamuri*, 274 F. Supp. 2d at 84, and it is plausible that after discovery, Gebretsadike could make a *prima facie* case of retaliation under Title VI.

First, the complaint plausibly alleges at least some actions that would constitute protected activity. To satisfy that element, Gebretsadike would only need to establish that "he had a reasonable good faith belief that the practice he opposed was unlawful under Title VI." *Id.* at 84. The complaint alleges that Gebretsadike "complain[ed] about the intentional discrimination by DOES, complain[ed] about lack of transparency and efficiency and DOES's discriminatory practices, demand[ed] DOES's final decision so that [he could] attain a lawyer," and "[brought] the matter to different authorities' attention including [the] DOES director, Inspector General, DC Council, etc." Compl. at 15. To be sure, some of those concerns have little to do with discrimination, such as a "lack of transparency and efficiency." *Id.* But even though, for the reasons explained above, *see supra* Part III.A, the complaint does not plausibly allege intentional discrimination, that does not mean Gebretsadike lacked a reasonable good faith belief that the acts of which he complained to the DOES director and others constituted unlawful discrimination under Title VI.

---

[4] Although *Chandamuri* was decided before *Twombly* and *Iqbal*, the Court notes that the Supreme Court in *Twombly* expressly reaffirmed its earlier holding in *Swierkiewicz* that an employment discrimination plaintiff need not plead a *prima facie* case under the *McDonnell Douglas* framework to survive a motion to dismiss. *See Twombly*, 550 U.S. at 569–70. At any rate, the District itself cites *Chandamuri* for the applicable standard, *see* Mot. to Dismiss at 6 n.1, and thus the Court will not consider at this time the impact, if any, of *Twombly* and *Iqbal* on the standards discussed in *Chandamuri* for pleading a retaliation claim.

"The reasonableness of a plaintiff's belief that [a defendant's] actions violate [the relevant statute] depends in part on whether the governing law is 'unambiguous' or 'unsettled.'" *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 38 (D.D.C. 2020) (quoting *King v. Jackson*, 487 F.3d 970, 973 (D.C. Cir. 2007)). Gebretsadike understood himself to be complaining about "intentional discrimination by DOES," Compl. at 15, and as this Court has noted, "[t]his circuit has yet to determine whether Title VI's prohibition against national origin discrimination encompasses differential treatment based on language proficiency," *Lemus*, 2022 WL 407151, at *8. Thus, it remains plausible that Gebretsadike could demonstrate a reasonable good faith belief—even if that belief was incorrect—that he was complaining of unlawful national origin discrimination prohibited by Title VI.

Second, the complaint plausibly alleges that Gebretsadike suffered an adverse action. In the retaliation context, an adverse action is one that "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Here, the complaint alleges that "[the District] would not provide benefits under the law despite [Gebretsadike's] continued [compliance with] the weekly certification obligations," that he was "made not to receive benefits when other similarly situated claimants received the benefits under the law," and that his "benefits remained reduced, [with] typical protective procedures and due processes [being] systematically held or denied" and "[c]hances [to] resolve and remedy [being] blocked by DOES." Compl. at 15–16. Read liberally, that suggests an allegation that the District delayed payment of Gebretsadike's PUA benefits, denied him some of the benefits he was supposed to receive, reduced the amount of the benefits he eventually received, and deprived him of opportunities ordinarily afforded for reconsideration

or an appeal. That is all action that "well might have dissuaded" a reasonable PUA applicant from complaining of discriminatory practices. *Burlington N.*, 548 U.S. at 68.

Third, the allegations in the complaint leave it plausible that Gebretsadike could establish a causal link between protected activity and an adverse action at the summary judgment stage. The timeline of Gebretsadike's allegations is somewhat unclear—the complaint does not specify precisely when he complained about "DOES's discriminatory practices." Compl. at 15. But it does allege that the District delayed, denied, and reduced his payments and cut off his opportunities for appeal "because he engaged in" those activities. *Id.* at 16. Moreover, it is plausible that Gebretsadike could prove that those involved in the alleged adverse action knew of his complaints, because he alleges that he complained to the "DOES director." *Id.* at 15.

Because the complaint, read liberally, plausibly alleges that the District delayed, denied, and reduced Gebretsadike's PUA benefits and cut off his opportunities for appeal because he complained of what he believed to be discriminatory practices by DOES personnel, the Court will not dismiss the Title VI retaliation claim in Count II of the complaint.

### 2.  First Amendment retaliation (Count IV)

The First Amendment provides in relevant part that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The elements of a First Amendment retaliation claim are essentially the same as those of a Title VI retaliation claim, except that different activity is protected by the First Amendment than Title VI. *See Doe v. District of Columbia*, 796 F.3d 96, 106–07 (D.C. Cir. 2015). Here, the District does not dispute that Gebretsadike engaged in activity protected by the First Amendment by complaining of alleged discriminatory conduct to the DOES director and other government officials. *See* Mot. to Dismiss at 10–12. Rather, it argues that Gebretsadike will never be able to make out a *prima facie* case of

First Amendment retaliation because the complaint alleges only that the District *maintained* its *existing* position of denying him the full extent of benefits he sought because of his engagement in protected First Amendment activity. *See id.*

The District is correct that, unlike the portion of the complaint alleging Title VI retaliation, the portion alleging First Amendment retaliation does not allege that Gebretsadike's protected activity prompted a delay or reduction in payment. *See* Compl. at 21–22. But the First Amendment portion of the complaint does allege that because of Gebretsadike's petitioning of various government officials, DOES personnel "continued to deny [his] due process and different mandatory procedural protections in part to suppress the correctness and legitimacy of the concerns he exposed to the relevant authorities." *Id.* at 22. As Gebretsadike argues, *see* Pl.'s Opp'n at 23, read liberally, that suggests an allegation that DOES closed off opportunities he otherwise would have had for appeal or reconsideration because of his complaints to authorities. Thus, the complaint plausibly states a predicate First Amendment violation.

However, the First Amendment retaliation claim, unlike the Title VI retaliation claim, is a claim of unconstitutional action under 42 U.S.C. § 1983, and the complaint does not allege the policy or custom necessary to support municipal liability under that statute. The complaint alleges the First Amendment claim against "the employees in their Official Capacity." Compl. at 21. "A § 1983 claim for damages against a D.C. officer in his official capacity is, in effect, a claim against the District itself," and thus a plaintiff bringing such a claim must allege a policy or custom under *Monell. Richardson v. District of Columbia*, 322 F. Supp. 3d 175, 186 (D.C. Cir. 2018). Here, the complaint includes no allegation whatsoever that a municipal policy or custom caused the alleged violation of Gebretsadike's First Amendment rights. *See* Compl. at 21–22.

14

Because the complaint does not allege the policy or custom necessary to support *Monell* liability on the First Amendment retaliation claim, the Court must dismiss Count IV.

### C. Procedural Due Process Claim (Count III)

The due process clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Gebretsadike alleges that the District deprived him of his Fifth Amendment due process rights by failing to provide adequate notice of the reasons for denying or reducing his PUA benefits and by denying him access to the procedures ordinarily available to contest such a decision. *See* Compl. at 17–21. The District argues that the complaint does not state a due process claim because Gebretsadike "received all the process he was due" through the possibility of an administrative redetermination process and/or an appeal to the D.C. Court of Appeals, Mot. to Dismiss at 9–10, and that the complaint does not plead a pattern or practice for purposes of *Monell* liability, *id.* at 7–9. The Court disagrees with the District on the first point but agrees on the second.

"In general, due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner' when an individual is deprived of liberty or property interests." *Robinson v. WMATA*, 167 F. Supp. 3d 118, 130 (D.D.C. 2016) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). "It is not disputed that unemployment benefits are a property interest protected by the due process clause, . . . and the Court will assume, without deciding, that a deprivation has occurred here," as the District does not expressly dispute that point in its motion to dismiss. *Stone v. Walsh*, 756 F. Supp. 2d 4, 9 (D.D.C. 2010) (internal quotation marks, alterations, and citation omitted); *see* Mot. to Dismiss at 9–10. But the question still remains what process is due when the District deprives an applicant like Gebretsadike of PUA benefits.

As the District notes, *see* Mot. to Dismiss at 10, a person denied unemployment benefits by DOES has access to remedies set out in D.C. Code §§ 51-111 and 51-112. Specifically, an unsatisfied applicant may appeal an initial determination to an appeals panel within DOES, which will conduct a hearing and may, "for good cause, [] reconsider[]" that determination. *Id.* §§ 51-111(b), (c). A redetermination by the appeals panel "shall be final within 15 calendar days after the mailing of notice thereof," *id.* § 51-111(b), after which the applicant "may seek review of such decision in the District of Columbia Court of Appeals in accordance with the District of Columbia Administrative Procedure Act," *id.* § 51-112. Sections 51-111 and 51-112 "provide[] the panoply of rights" guaranteed by the due process clause, and thus courts in this District have held that where they are available, a complaint cannot state a claim for violation of an unemployment applicant's due process rights. *See Stone*, 756 F. Supp. 2d at 10.

Gebretsadike does not dispute that the statutory procedures are constitutionally adequate—rather, he argues that the District did not make those procedures available to him. Specifically, he argues that "[t]he [District] never made eligibility determinations or there was no final decision made so that [he] would be able to go through the due process path below." Pl.'s Opp'n at 20–21. The complaint, read liberally, bears that out. While it alleges that DOES sent Gebretsadike an initial determination letter with instructions on how to pursue an administrative appeal, it also alleges that he did apply for a "re-determination" before an appeals panel, but that DOES had still failed to act on that application by the time of the complaint, over two years later. Compl. at 7; *see* D.C. Code § 51-111(b).

The District does not meaningfully engage with those allegations. Rather, it argues flippantly that "[a]lthough Plaintiff bemoans that he did not receive 'an interview,' . . . the District gives Plaintiff a host of ways to present evidence and be heard under D.C. Code § 51-111." Mot.

to Dismiss at 10 (quoting Compl. at 7). But even setting aside the District's apparent non-concern that DOES allegedly denied Gebretsadike access to a procedural safeguard guaranteed by the statute, the District does not even acknowledge the complaint's allegation that Gebretsadike indeed filed an administrative appeal and DOES never acted on it *at all*. And so the District fails to demonstrate that the complaint does not state a predicate due process violation, because the complaint plausibly alleges that the procedures the District points to as constitutionally adequate were not in fact available to Gebretsadike. *Cf. Parrott v. District of Columbia*, No. 21-cv-2930-RCL, 2023 WL 2162859, at *8 (D.D.C. Feb. 22, 2023) ("[I]t makes little sense to evaluate the constitutional sufficiency of procedures if those procedures are not actually available.").

But that is not the end of the matter, as the procedural due process claim is brought under § 1983, and thus the complaint must allege a pattern or practice for purposes of *Monell* liability. The District argues that the complaint at most makes wholly conclusory allegations that the District "has adopted a process" or custom resulting in constitutionally inadequate procedures. Mot. to Dismiss at 8–9 (quoting Compl. at 19). The Court agrees that the allegations about adopting a process are conclusory, as the complaint alleges no factual matter that would support them.

The question of whether complaint alleges deliberate indifference—another permissible basis for municipal liability under § 1983—is somewhat closer, but the District still prevails. "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker*, 326 F.3d at 1307. For example, in *Baker*, the Circuit held that the plaintiff stated a claim for municipal liability based on deliberate indifference by alleging that he repeatedly complained of Eighth Amendment violations to District policymakers but that those policymakers consistently ignored those complaints and refused to investigate them. 326 F.3d at 1307.

Here, the complaint repeatedly alleges that the District "knew or should have known" of the alleged due process violations, *see* Compl. at 17–21, but the portion of the complaint setting out the procedural due process claim is sparse on *why* the District knew or should have known. Earlier on, the complaint alleges that Gebretsadike "continued contacting different authorities [he] could think of in the District of Columbia government and other authorities including DOES's director." Compl. at 3. Even read liberally, that is at most an allegation that Gebretsadike *attempted* to contact at least one relevant policymaker—the director of DOES—at least one time. That allegation rises to nowhere near the level of the allegations in *Baker* of policymakers' repeated ignorance of repeated complaints of constitutional violations. It simply is not plausible that, even if Gebretsadike's allegations are true, the District knew or should have known that its officers were violating his due process rights and deliberately disregarded that risk. Thus, the complaint does not state a claim for municipal liability under § 1983 based on a theory of deliberate indifference.

Gebretsadike's procedural due process claim plausibly alleges a constitutional violation on the theory that the District did not allow him recourse to its own statutory administrative process. But that only gets him halfway there. Because the complaint does not plausibly plead a valid basis for *Monell* liability, the Court must dismiss Count IV.

### D. Social Security Act Claim (Count VI)

Gebretsadike alleges that the District violated two provisions of the Social Security Act by delaying, denying, and reducing his unemployment benefits. Specifically, he alleges that the District violated 42 U.S.C. §§ 503(a)(1) and (3), which provide in relevant part that "[t]he Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act, includes provision for . . . (1) [s]uch methods of administration . . . as are found by the Secretary

of Labor to be reasonably calculated to insure full payment of unemployment compensation when due; and . . . (3) [o]pportunity for a fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied." *See* Compl. at 26–27. The District argues that those provisions do not require an outcome in any individual applicant's case, but rather regulate states' statutory and regulatory schemes for the payment of unemployment benefits. Mot. to Dismiss at 13–14. The Court agrees with the District.

A plaintiff alleging a violation of § 503(a) must point to a state law that conflicts with its requirements. For example, in *Cal. Dep't of Human Res. Dev. v. Java*, 402 U.S. 121, 129–35 (1971), the Supreme Court held that a California statute requiring unemployment payments to be withheld while appeals of determinations were pending violated § 503(a)(1)'s "when due" requirement. But while "[a]pplicable federal statutes and regulations provide broad guidance on administering [state unemployment] programs, [] they do not require that states make initial determinations to grant or deny claims in any particular manner." *D.C. Dep't of Employment Servs. v. Vilche*, 934 A.2d 356, 361 (D.C. 2007). The District's procedures, as noted above, are laid out in D.C. Code §§ 51-111 and 51-112. And Gebretsadike does not actually challenge the applicable D.C. statutory provisions. Rather, he argues that DOES officials' alleged *noncompliance* with those provisions in his case violates the federal statute. *See* Pl.'s Opp'n at 27–33.

That sort of claim is inconsistent with the text of the statute. Nowhere does Gebretsadike explain how a plaintiff can maintain an action under a federal statute regulating the "provision[s]" that "the law[s] of [the] State[s]" must "include[]," 42 U.S.C. § 503(a), based on state officials' failure to follow in an individual case a state statute that is facially consistent with the federal statute. He does not cite any example of a court recognizing such an as-applied challenge under § 503(a). And at least one court has rejected the existence of such a claim on grounds that it would

conflict with more recent Supreme Court precedent. In *Sterling v. Feek*, No. 22-cv-5250, 2022 WL 16699191, at *8–9 (W.D. Wash. Nov. 3, 2022), the court rejected a challenge to allegedly untimely unemployment determinations under § 503(a) that did not challenge a state statute, on grounds that § 503(a), which is directed at the Secretary of Labor, does not include the sort of rights-creating language that the Supreme Court held in *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002), is required to confer a private cause of action. As the *Sterling* court reasoned, although the Supreme Court recognized a private cause of action under § 503(a) in *Java* and has never overruled that decision, *Java* was decided long before *Gonzaga* and involved a state *statute* that violated the Social Security Act. 2022 WL 16699191 at *8–9. And since *Gonzaga* has since severely restricted the sorts of statutory language that courts may read to create private rights, the *Sterling* court reasoned that *Java* should be limited to its holding and not read to authorize private actions involving anything other than facial challenges to state statutes. *Id.* This Court agrees and therefore holds that Gebretsadike may not bring an action under § 503(a) alleging *noncompliance* with the District's unemployment laws.

Moreover, even if a plaintiff could bring a claim under § 503 in general for a state's noncompliance with its own applicable laws setting out unemployment application procedures, Gebretsadike's claim here would fail on the merits to the extent that it relies on § 503(a)(1)'s "when due" requirement. The Supreme Court held in *Java* "that the word 'due' in [§ 503(a)(1)], when construed in light of the purposes of the Act, means the time when payments are first administratively allowed as a result of a hearing of which both parties have notice and are permitted to present their respective positions." 402 U.S. at 133. In other words, § 503(a)(1) requires prompt payment of benefits when it has been *determined* that benefits *are due*.

Because the complaint does not allege that the statutory scheme itself violates the Social Security Act, the Court must dismiss Count VI of the complaint for failure to state a claim.

### E.   D.C. Law Claim (Count VII)

Gebretsadike alleges that the District violated D.C. Code § 51-111(b) and 7 D.C. Mun. Reg. §§ 305.1, 305.6, and 306.1 by failing to make a prompt, final decision on his administrative appeal. Compl. at 27–28. The District argues that the Court lacks jurisdiction over that claim under the District of Columbia Administrative Procedure Act ("DCAPA") and that the cited statute and regulations do not create an independent, private cause of action. Mot. to Dismiss at 14–17. The Court agrees with the District.

As noted above, the D.C. statute setting out procedures for unemployment benefit applications provides that "[a]ny person aggrieved by the decision of the Director [of DOES] may seek review of such decision in the District of Columbia Court of Appeals in accordance with the District of Columbia Administrative Procedure Act." D.C. Code § 51-112. And in turn, "[t]he DCAPA's judicial review provision places exclusive jurisdiction in the D.C. Court of Appeals to review District agency action." *Lightfoot v. District of Columbia*, 448 F.3d 392, 399 (D.C. Cir. 2006); *see* D.C. Code § 2-510; *Mathis v. District of Columbia Hous. Auth.*, 124 A.3d 1089, 1099 (D.C. 2015). Thus, to the extent that Gebretsadike's D.C. law claim seeks review of agency action under the DCAPA, this Court lacks jurisdiction over that claim. *See States v. District of Columbia*, No. 18-cv-1652-ABJ, 2019 WL 295472, at *7 (D.D.C. Jan. 23, 2019). Gebretsadike does not confront that problem in his opposition. *See* Pl.'s Opp'n at 33–39.

To the extent that Gebretsadike wishes to assert his D.C. law claim under a cause of action independent of the DCAPA, the relevant statute and regulations do not create a private cause of

action on their own. Under D.C. law, courts must consider three factors in determining whether a statute creates a private right of action:

> First, is the plaintiff one of the class for whose *especial* benefit the statute was enacted . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*In re D.G.*, 583 A.2d 160, 166 (D.C. 1990) (emphasis and ellipses in original) (internal quotation marks omitted) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)). "The ultimate issue is whether the legislature intended to create a particular cause of action." *Coates v. Elzie*, 768 A.2d 997, 1001 (D.C. 2001) (internal quotation marks and citation omitted).

Gebretsadike's D.C. law claim does not satisfy that standard. To be sure, as even the District concedes, *see* Mot. to Dismiss at 16, as an applicant for unemployment benefits, Gebretsadike is an intended beneficiary of D.C. Code § 51-111(b), which applies to "individual[s] [who] ha[ve] filed a claim for benefits." The same could be said of 7 D.C. Mun. Reg. §§ 305.1, 305.6, and 306.1, which are that statute's implementing regulations. But none of those provisions satisfy the other two factors of the *In re D.G.* test. They simply lay out procedures for administrative determinations and appeals, and nothing in their text suggests an intent to allow independent recourse in any court. To the contrary, the express provision for a right of review by the D.C. Court of Appeals in the statutory section that follows § 51-111 strongly suggests that the Council *did not* intend trial courts to get involved outside of that process. *See* D.C. Code § 51-112. And a right to sue in court would be inconsistent with the purpose of the legislative and regulatory scheme, as it would interfere with the very administrative process that the Council envisioned.

Gebretsadike's only response to these problems is to argue that there is no express provision *precluding* a private cause of action, and that "the procedural protections are so critical

that it is consistent with the purposes of the legislative scheme to imply a private right of action." Pl.'s Opp'n at 39. But he cites no authority for the proposition that the mere *absence* of a provision *precluding* a private cause of action is enough to imply that one exists. And the fact that a procedural protection is "critical" does not in itself answer whether recourse in the courts to vindicate that protection is consistent with a legislative scheme. Accordingly, Gebretsadike fails to demonstrate that any of the cited statutory or regulatory provisions create a private cause of action under D.C. law.

Because this Court lacks jurisdiction to review D.C. agency action under the DCAPA and the cited statute and regulations do not create an independent private cause of action, the Court must dismiss the D.C. law claim in Count VII for lack of subject-matter jurisdiction.

## IV.   CONCLUSION

For the foregoing reasons, the Court will **GRANT** in part and **DENY** in part the District's motion to dismiss. Specifically, the Court will **DISMISS WITHOUT PREJUDICE**[5] Counts I and III–VI for failure to state a claim and Count VII for lack of subject-matter jurisdiction. The Court will not dismiss Count II. A separate Order shall issue this date.[6]

Date: March **30** , 2023

*Royce C. Lamberth*
Royce C. Lamberth
United States District Judge

---

[5] "[A] dismissal for want of subject-matter jurisdiction can only be without prejudice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1253 (D.C. Cir. 2020). Even where a complaint fails to state a claim, "the standard for dismissing a complaint with prejudice is high: dismissal *with prejudice* is warranted only when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012) (internal quotation marks, citations, and ellipsis omitted). Here, Gebretsadike argues that if the Court dismisses any of his claims, it should do so without prejudice. Pl.'s Opp'n at 10. The District does not explain why dismissal should be with prejudice. *See generally* Mot. to Dismiss; Defs.' Reply. Accordingly, and particularly because Gebretsadike is proceeding *pro se*, the Court will dismiss the claims identified above without prejudice in order to afford him an opportunity to seek leave to amend his complaint and attempt to cure its deficiencies.

[6] Finally, the Court notes that Gebretsadike's briefing is some of the strongest it has seen from a *pro se* litigant. While not all of his arguments carry the day, the depth of his research and the strength of his arguments on some points are remarkable for a non-lawyer with an imperfect command of English.